## HUDSON MFG. CO. v. LOUDEN MACHINERY CO.

(Circuit Court of Appeals, Eighth Circuit.    September 24, 1921.)

No. 5528.

1. **Patents ⬤═328—990,827, for cattle stanchions, held valid and infringed.**
   The Louden patent, No. 990,827, for cattle stanchions, claims 1, 2, and 3, *held* valid and infringed.

2. **Patents ⬤═167 (1)—Claims to be construed with specification and drawings.**
   The claims of a patent and the specification and drawings are to be construed together for the purpose of ascertaining from the entire contract between the United States and the patentee, of which each is a part, the actual intention of the parties.

Appeal from the District Court of the United States for the District of Nebraska; Joseph W. Woodrough, Judge.

Suit in equity by the Louden Machinery Company against the Hudson Manufacturing Company, impleaded as the Hudson & Thurber Company.    Decree for complainant, and defendant appeals.    Affirmed.

James F. Williamson, of Minneapolis, Minn., for appellant.

W. Clyde Jones, of Chicago, Ill. (Robert Lewis Ames, of Chicago, Ill., and John G. Barwise, of Fairfield, Iowa, on the brief), for appellee.

Before CARLAND, Circuit Judge, and LEWIS and COTTERAL, District Judges.

LEWIS, District Judge.    The Louden Machinery Company brought this suit against the Hudson Manufacturing Company, charging in its complaint that the latter was infringing upon rights secured to the former by Letters Patent No. 990,827, for an improvement to cattle stanchions, issued to William Louden on April 25, 1911, on his application made September 26, 1907, which Louden had assigned to plaintiff, and also charging defendant with unfair competition in putting on the market stanchions so like plaintiff's improved patented device in form, type, style, size and appearance that the trade could not distinguish between them, and prayed that defendant be enjoined, and for judgment for profits received by defendant, and for damages, and to that end that discovery and accounting be had.

The answer set up as defenses that Louden was not the original and first inventor, that his patent is void because the improvement claimed by him was not novel, that it was old in the prior art, that it had been previously patented to others and that it had been on public sale and in use for more than two years prior to his application.    It denied specifically invention by Louden and infringement and unfair competition by defendant, and plead abandonment by plaintiff.

[1] The case went to a Master, who took the proof and found all of the issues in favor of the plaintiff below.    His report states his conclusions as to the material and controverted facts, and contains

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

his views as to the law applicable thereto, and he recommended that
a decree be entered in favor of the complainant, finding the patent
valid and that the defendant had infringed on the patent 'rights as
to Claims 1, 2 and 3, and had been guilty of unfair competition in
trade.   The trial court regarded appellant's exceptions to the find-
ings and conclusions of the Master as bringing all the facts under
review, and "assumed the burden of reaching an independent decision
upon the substantial merits without regard to any presumptions in
favor of the Master's action."   It thereafter overruled each and
all of the exceptions and found that "The findings of fact conform
to the preponderance of evidence and no contrary determinations
could fairly be made upon the record presented";  and decreed the
patent valid and Claims 1, 2 and 3 thereof deliberately and wilfully
infringed upon by defendant, and that defendant had been guilty of
unfair competition in trade as charged in the complaint, "in that it
has made and marked its said stanchions by devices and represen-
tations calculated to mislead and deceive the ultimate purchasers or
users of stanchions, and with the intent in effect of misleading and
deceiving said ultimate purchasers or· users in violation of the rights
of plaintiff."   It was further decreed that the defendant be permanent-
ly enjoined from further infringement, and that plaintiff recover profits
received by defendant and damages sustained by it by reason of the in-
fringement and unfair competition.   The claims charged to have
been infringed upon are these:

"1. In cattle stanchions, two coacting members having their central portions
spaced apart and approximately parallel, and their upper and lower portions
inclined toward each other at a uniform angle, the bends in the members
forming said inclines being at equal distances from the respective ends, and
the inclined portions beyond the bends being approximately straight, a hinge
connection affixed to the lower meeting ends of the members and latching
means secured to the upper meeting ends of the members, whereby they may
be opened and closed and latched together and unlatched from each other.
"2. In cattle stanchions, two coacting members having their central portions
spaced apart and approximately parallel, and their upper and lower portions
inclined toward each other at a uniform angle, the bends in the members
forming said inclines being at equal distances from the respective ends, and
the inclined portions beyond the bends being approximately straight, and
connections having straight ends secured to the ends of the members in such
relation as to operate therewith regardless of the lengths of the inclined
portions of the members.
"3. In cattle stanchions, two coacting members having their central portions
spaced apart and approximately parallel, and their upper and lower portions
inclined toward each other at a uniform angle, the bends in the members
forming said· inclines being at equal distances from the respective ends, and
the inclined portions beyond the bends being approximately straight, latch-
ing·means secured to the upper meeting ends of the members, a hinge casting
secured to each of the lower·meeting ends of the members and a bolt to con-
nect said castings together.".

Before Louden, the two ends of cattle stanchions were square or
circular.   Those with round ends, when made of metal, required
that each end of each side member be bent to an approximate quar-
ter-circle.   Appropriate metal fittings secured over the ends of the
members joined them together at top and bottom, the one at bot-

tom having a hinge and at the top means for latching and unlatching, so that when unlatched a side member would swing out and permit the animal's head to pass through. Then the side member could be swung back on the hinge at the bottom and securely latched at the top. Taking the drawings which accompanied Louden's application and are a part of the specification in his letters patent, we find that the ends of his stanchion are in form V-shaped. The contrast between stanchions with round ends and those with V-shaped ends, without the couplings at top and bottom, is illustrated by Foster's patent, issued in 1903, compared with Louden's, thus:

*Fig. 1.*
FOSTER № 734532.

*Fig. 2.*
LOUDEN PATENT IN SUIT.

The difference between the two is obvious. The semi-circular ends require bends, each covering 90 degrees, while the V-shaped ends include angles of only 45 degrees, that is, the ends are deflected inwardly to that extent; and the ends of the former rest at approximate horizontal, while those of the latter stand at approximate 45 degrees from the perpendicular. It seems unnecessary to illustrate the square-end type.

The evidence convinced the Master and the trial court that the strain of cattle held in stanchions having flat or Roman arched ends had a tendency to twist or turn the side members on their horizontal axis at their ends within the hinge and latch fittings which coupled and held them together, and thus to break or weaken the point of union; and they were further convinced that Louden's V-shaped ends greatly lessened, if it did not wholly eliminate the effect of that strain by transferring a large part of it into a lateral pull on the four ends of the side members. And so the Master found, and the court sustained the finding, that

"The 'V' shaped end conformations practically eliminate torsional strain on hinge and latch fittings when cattle lunge forward or backward against the stanchion sides in reaching to their feed, or in getting up and lying down,

or in trying to get out of the stanchions, in comparison with the torsional strain on the hinge and latch fittings of any stanchions of the prior art."

And we, after a review of the record, reach the same conclusion. Louden's improvement, then, was not merely a change in the form of the stanchion, but such a change employed and put in action mechanical principles and powers not available in the use of stanchions then used or known to the trade or shown in any prior patent. It converted, in large part, the strain exerted on the coupling members from torsion to tention, and in this way obviated the tendency to loosen them and put them out of repair.

The evidence also convinced the Master and the trial court that the flat or Roman arched ends afforded occasion to the animal to get its forefoot or leg fast under the end of the stanchion, so that in attempting to extricate it the animal might be seriously injured. Evidence was adduced of such occurrences, showing that valuable animals had been almost wholly ruined in that way. And so the Master found, and the finding was sustained by the trial court, that

"The sloping or V-shaped end formations make it practically impossible for cattle to get their forelegs or feet caught between the bottom of the stanchions and the sill or curb of the frame or stall, as compared with any stanchions of the prior art."

We think that conclusion also is sustained by the proof. These two elements in Louden's improvement gave functional advantages not to be obtained in the use of stanchions with square or circular ends.

It is also shown without contradiction that to make the quarter-circle bend on the ends of metal stanchion members it was necessary to use a machine, and that in gripping the end of the member in the machine for that purpose it became necessary, after the bend was made, to cut off and throw aside three or four inches of each end of each member, and that only one end of the member could be bent at one time; whereas, both ends of a side member, as shown in Louden's drawings, could be made at once by placing the member in a stamping press, and that none of the material was wasted or had to be cut off. Also each side member with a quarter-circle bend was about three inches longer in a completed stanchion than the member in a stanchion made with V-shaped ends, although the two stanchions when completed are of the same length and width. Furthermore, the Louden bend could be made easily of hard tubular steel, which was the most desirable, both in strength and form, without damage to the material, whereas, it was difficult to make the quarter-circle bend of such material without great risk of damage, if at all; and the bends made in the stamping press will be in alignment, but if made by a bending machine one end at a time they are not always so, and require further work to bring them in alignment.

Louden first made and put out for use his stanchions in December, 1905, or early in January, 1906. In the latter year 2,745 were marketed and the number increased every year thereafter, so that in 1910, the year just previous to the issuance of his patent, 52,472 were made and sold. The appellee had succeeded in entering into

a contract in 1908 with the Elyria Iron & Steel Co. of Elyria, Ohio, to furnish high carbon steel bent pipes in accordance with the plans and instructions furnished by appellee for the side members of the Louden stanchion, and after that the number of stanchions which appellee was able to dispose of became very large, amounting to 577,-201 for the twelve years from 1906 to 1917, both inclusive, which were sold, at a total of $626,230.00. The stanchion had proven a success, and none other could compete with it commercially. It gained the name and reputation of the Louden bend. The appellant purchased the rights of the Foster patent, with round ends, but found that it could not successfully compete with the Louden stanchion. It found that in order to do so it was necessary to make a stanchion with V-shaped ends, and it thereupon entered into a contract for the purchase of the bent side members. That contract, as well as correspondence between it and the manufacturer who furnished it with the side members, refers to the bend as the Louden bend, and appellant thereupon put upon the market its stanchion, charged as the infringing device under the name of "Modoc 60," which is an exact copy of the drawings accompanying the Louden patent, as to side members.

Considering, then, Claims 1, 2 and 3 of the Louden patent in connection with the specification and drawings which are a part of it, under the evidence we do not doubt that his improvement was new and useful, that he was the original and first discoverer, and that it was patentable.

[2] But appellant argues that the language of Claims 1, 2 and 3 is simple and their meaning clear, that the thing described is obvious and that, therefore, there is no room for interpretation; hence the specification and drawings relied upon in reaching the foregoing conclusions cannot be resorted to. But none of the claims deals with the angle of the bends directly, though indirectly they require that the bends shall be at uniform angles, that is, "their upper and lower portions inclined toward each other at a uniform angle." This requirement could be met by deflecting the ends so that they would circumscribe an obtuse angle, resulting in an unusable and absurd structure, or to circumscribe an angle so acute that it would be wholly unfitted for the intended purpose. This, we think, renders the claims ambiguous as to the degree to which the ends should be deflected from their course, and makes clearly applicable to this case the familiar principle announced in O'Brien-Worthen Co. v. Stempel, 209 Fed. 847, 128 C. C. A. 53, wherein this court held:

"The specification and claims of a patent constitute a contract between the United States and the patentee, and they are to be read and construed together in the same way and by the same rules by which other contracts are interpreted. The specification which forms a part of the same petition or application as the claims must be read and interpreted with them, not for the purpose of limiting, or of contracting, or of expanding, the latter, but for the purpose of ascertaining from the entire agreement, of which each is a part, the actual intention of the parties."

See, also, I. T. S. Rubber Co. v. Panther Rubber Mfg. Co., 260 Fed. 934, 171 C. C. A. 576; Stilwell-Bierce & Smith-Vaile Co. v.

Eufaula Cotton Oil Co., 117 Fed. 410, 54 C. C. A. 584; Canda v. Michigan Iron Co., 124 Fed. 486, 61 C. C. A. 194; Lamb Knit Goods Co. v. Lamb Glove & Mitten Co., 120 Fed. 267, 56 C. C. A. 547. Turning to the specification we find this:

"These members * * * have their upper and lower ends bent toward each other at an angle of approximately 45 degrees, so that they will meet the corresponding ends of the opposite members approximately halfway and will stand at approximately right angles to each other. The bends may be gradual curves, but between the curves and the end of the members, .there must be a straight portion long enough and inclined at the proper angle to receive and support the hinge and latch members."

The drawings which accompanied the patent referred to in that part of the specification just read show the ends of the side members bent toward each other at an angle of approximately 45 degrees, and that they stand at approximately right angles to each other. When the claims are thus interpreted and construed the conclusions which we have reached therefrom seem to necessarily follow, so that the patented improvement, as defined by the claims, when read in the light of the specification and drawings, consisted in a stanchion having V-shaped ends bent toward each other at an angle of approximately 45 degrees and standing toward each other at approximately right angles.

It is also contended that appellee is estopped by the file wrapper record to claim that Louden's patent calls for a stanchion with approximate 45 degree bends in its side members. It is true that Claim 2 in Louden's original application called for an angle of approximately 45 degrees, and that this claim was rejected by the examiner. Claims 5 and 6 in that application, which provided that the side members should have their upper and lower ends bent at a uniform angle, were allowed. This action of the examiner appears to have been taken because of difference in the hinge members as found in the rejected claims from those which were allowed. The applicant then put in a claim which provided that the meeting ends of the two members should stand at approximately right angles to each other, which by indirection was a reinstatement of the rejected claim. This also was rejected by the examiner on his ruling that the shape of the side members was a matter of design. The applicant contended "there is more in the shape of the members A and B (side members) than mere design," but the examiner persisted in his holding that to bend the ends to form an angle with the main part of the member did not involve patentability. The applicant submitted to the ruling and then put in the claims as we now have them. The specification in the original application contained this:

"These members * * * have their upper and lower ends bent at an angle of approximately 45 degrees, so that they will meet the corresponding ends of the opposite members approximately halfway."

To this was added, "and will stand at approximately right angles to each other," as now found in the specification. In view of the construction that we have given to Claims 1, 2 and 3, we fail to find facts necessary to support the claim of estoppel.

In April, 1905, William Louden made his application for letters patent for improvement in cattle stanchions, which he did not press to final determination but abandoned. The file wrapper in that proceeding was introduced in evidence. It is contended that that application, taken in connection with stanchions that Louden made and put on the market about that time, operated as an abandonment by him and dedication to the public of the stanchion which the appellee now claims exclusive right to make and sell under patent No. 990,827. That application contained no claim for a stanchion with V-shaped ends nor that the side members shall be bent to any approximate angle, nor that the side members shall meet each other at approximately right angles, nor is the word "angle" used at all in any connection, either in the claims or specification in that application. The drawings which accompanied it showed a stanchion with circular or Roman arched ends. Louden made and sold some stanchions, as he testified, in accordance with that application, with round or circular ends, out of gas pipe, which is soft and easily bent, as compared with high carbon steel tubing. The experiment was a failure. The side members were bent out of shape, causing the latch and hinge members to become unworkable and needing repair. Some of them were returned to Louden for repairs, others, after being used a few months, were thrown aside as unusable, and some of them found their way to the scrap pile and were sold as junk by the pound. Ten years and more had passed, but appellant found and brought into court two of them, on which it relied and attempted to show that the side members were made with straight ends at the points of meeting for attachment of hinge and latch members. At best the evidence put in serious doubt whether the ends were in the same shape as they were when put out by Louden, and also when the change, if any, had taken place. But conceding to it all that appellant claims we regard the fact of slight significance. The most that could be claimed is that the ends were approximately straight for only about three inches, and extended but slightly, if at all, beyond the hinge and latch members. That condition would exist in stanchions with semi-circular ends also. At least the variation between the two exhibits relied upon and a stanchion with semi-circular ends would be slight in that respect and of no significance. We agree with the court below that the evidence relied upon does not sustain the contention.

It has not seemed to us necessary to review here the testimony on the question of unfair competition, further than to say that we are of opinion that it abundantly sustains that issue in favor of the plaintiff below. Reserving to appellee its right to have the profits and damages to which it may be entitled assessed the decree is affirmed.

The appellant's motion to tax the cost of printing parts of the transcript of the record which were brought up by appellee's praecipe will be overruled, and the clerk is directed to enter an order accordingly.